[No. 31920.  Department One.  April 3, 1952.]

ARLIE LEONE SHAY, *Individually and as Executrix, et al.,
Appellants,* v. ARNES E. ARCHAMBO *et al., Respondents.*[1]

[1]Reported in 242 P. (2d) 511.

*Frank J. Blade,* for appellants.

*Huneke & van Tyen,* for respondents.

MALLERY, J.—The plaintiff brought this action in fraud to rescind the contract of sale of a motor court. At the conclusion of the trial, the court made the following conclusion of law:

"There is no clear, cogent or convincing evidence of fraudulent misrepresentations made by defendants to plaintiffs which induced the sale of the Motor Court to plaintiffs, and the plaintiffs' action for rescission should be dismissed."

From a judgment of dismissal, the plaintiff appeals.

The motor court was advertised for sale in the Post Intelligencer on May 1, 1949. The purchasers, Mr. and Mrs. Shay, answered the advertisement, and received a reply from the respondents, dated May 10, 1949, stating, among other things: "As stated in our ad, there are eleven units. *These are white stucco* with green trim and are built in a U shape." (Italics ours.)

The rear of the cabins was not stucco. No representation with regard to this item appears in the record, other than the italicized phrase above quoted. It relates to an obvious fact. We will not overturn the trial court's finding, which is:

"That the lack of stucco on the back of the motor court was *open to observation,* and there was no evidence that plaintiffs relied on the entire motor court being stuccoed, or that they were damaged in any way by reason of the fact that the rear portion of the Court was not stuccoed." (Italics ours.)

On May 20, 1949, Mr. and Mrs. Shay went to Spokane and were taken on an inspection tour of the motor court by the respondents. They were given the *prospectus* around which much of the present controversy centers. The background with regard to it is that the respondents had purchased the motor court from J. F. and Bernice A. Burdett on October 5, 1948, and decided to sell it sometime during February, 1949. The respondents caused a Mr. Chamberlain, who was the

bookkeeper for the Burdetts, the respondents, and later the appellant, to make a financial compilation from the Burdett books for the period between January 1, 1948, and July 31, 1948. Its accuracy is not challenged by the appellant. We set it out in full:

"NORTHWEST MOTOR COURT
3624 E. Sprague Avenue
Spokane, Washington

For a *recent* seven month period—which included less than half of the 'peak season' business—the actual book figures covering Income and essential Expenses are shown in the first column. Average monthly figures are shown in the second column. Twelve times the monthly average for the period involved is (we believe) a very fair and conservative schedule of annual operations.

|  | Seven Months | Monthly Average | Twelve Months |
|---|---|---|---|
| GROSS INCOME | $9,154.00 | $1,307.71 | $15,692.52 |
| EXPENSE: |  |  |  |
| Fuel | 651.40 | 93.06 | 1,116.72 |
| Light | 128.96 | 18.42 | 221.04 |
| Water | 39.75 | 5.68 | 68.16 |
| Garbage | 18.00 | 2.57 | 30.84 |
| Laundry (*) | 675.00 | 96.43 | 1,157.16 |
| Taxes | 175.00 | 25.00 | 300.00 |
| RENT | 700.00 | 100.00 | 1,200.00 |
| Insurance | 182.56 | 26.08 | 312.96 |
| Total | 2,618.74 | 374.11 | 4,489.32 |
| NET OPERATING PROFIT | $6,535.26 | $933.61 | $11,203.32 |

(*) *For the period indicated, the bulk of the Laundry was 'sent out'— the present operator* is doing the bulk of the Laundry himself and thereby effects a saving of better than $50.00 per month—this increases the Net Operating Profit to $11,803.32. However, *neither the present operator nor his predecessor* had any previous experience whatever in Motor Court operation. An experienced operator could no doubt effect very substantial savings in operating costs together with probable increase in Income. Considered in the light of 'possibilities' only—the Court has a 'potential' income of approximately $2,000.00 per month for the peak season probably without substantial increase in operating costs—except Laundry.

As stated above, these schedules are based on actual book figures for the essential operating accounts and (*we believe*) reflect a true and correct picture of the income and essential operating costs of conducting the business." (Italics ours.)

Appellant proved that her fuel bill was much greater than that set out in the above instrument. The fraudulent misrepresentation, upon which she relies, is that she was

told, by the respondents, that the instrument represented their own operation figures, not those of the Burdett management period. In corroboration of her testimony, she calls attention to the invitation in the respondent's letter of May 10, 1949, previously mentioned, to "inspect the court and *our* book figures." (Italics ours.) She does not contend that she asked to see respondents' books, although much is made of the remark of respondents that "our books are in possession of our bookkeeper, who is not here." We call attention to the italics in the prospectus as internal evidence that it does not itself purport to be respondents' own figures. The oral evidence is in dispute. Archambo denied that he had represented the figures to be those of his own operation. The court believed him. We do not find that there is clear, cogent, and convincing evidence to the contrary.

The appellant contends that respondents fraudulently said they had made a profit every month. The respondents denied this, and the trial court believed them. On matters of credibility we rely heavily on the trial court, and, therefore, sustain its finding.

The appellant contends that the linens, bed pads, and floors were in bad condition, and that the respondents had fraudulently represented them to be "first class" or "A-1." We quote appellant's supporting reference to the statement of facts.

"Q. What was said by either Mr. Archambo or Mrs. Archambo relative to this being a first-class, A-1 motel court business? WITNESS: A. They said it was a first-class motor court, one of the finest in Spokane. Q. How about A-1? A. That it was A-1."

As to these items, the trial court found:

"That prior to entering said Sale Agreement, defendants made no representation as to the quality or kind of linens at the Motor Court, but only as to the quantity, and plaintiffs had an ample opportunity to observe such linens.

"That the bed pads in the Motor Court were open to observation of plaintiffs prior to the sale, and defendants made no specific representation on the condition of the bed pads.

"That if any floors in the Motor Court were warped or rotten, such condition was open to observation of the plaintiffs, and no representation was made by defendants except that the Motor Court was in A-1 condition."

The appellant's testimony, quoted above, is not sufficiently clear, cogent, and convincing to require us to overturn the trial court's findings.

The appellant contends that the respondents made the fraudulent representation that "the roofs are in good condition and do not leak." We set out that part of the record to which appellant refers in support of her contention.

Mr. Wasser testified:

"Q. After Mr. and Mrs. Shay had taken possession and started operating the motor court, were you present there when they had difficulty with roofs leaking? A. Yes, in the cabin we stayed in, me and my wife. Three dresses were ruined and a new Samsonite bag sitting there, at the time we were there. Q. Oh, this was during the time Archambos were running it? A. Yes. Q. And your cabin leaked? A. Yes, down the side of the wall. In that particular cabin you hang your clothes against the wall, in that particular cabin. The Samsonite bag was molded, and three dresses were ruined. Q. Do you know whether Mr. and Mrs. Archambo were aware of that condition? A. No, I don't. I didn't tell them, and I don't know if anyone else did."

The appellant testified:

"Q. What, if anything, did Mr. Archambo or Mrs. Archambo say on your first visit here, about May 20th, 1949, as to the condition of the roofs of these buildings? A. Well, we saw that the house—there was water spots in it. Mr. Shay asked him about the roofs. He said they had leaked, but they had all been fixed. Q. When did he say they had been fixed? A. He didn't specify any date. He said they had been fixed. Q. What, if any, statement was made by him as to whether or not the roofs still leaked? A. He said they had been fixed, *so we figured they didn't leak.*" (Italics ours.)

We are not prepared to hold that this evidence is so clear, cogent, and convincing as to require our overturning the trial court's finding thereon.

The appellant contends that the respondents made a fraudulent representation that the "water pipes never freeze." We set out her testimony:

"Q. Was anything said by Mr. Archambo with regard to whether or not the cabins had any difficulty with freezing pipes? A. *No. I asked him how the winters were, if they had any trouble, and he said they never did.*" (Italics ours.)

Later on, to strengthen this testimony, she testified:

"Q. Before that check had been signed, and on this June 8th, 1949, what, if anything, was said by Mr. Archambo, regarding whether or not the pipes and water system of the motor court froze in the winters? A. We explained to Mr. Archambo that I would have to do the majority of the work, that is why we would have to have it. We asked him about the winters there and then asked him if the pipes ever froze. He said, 'No, I have never had any trouble with them.' Q. What were his exact words to you, now? A. I believe those were the exact words, 'I have never had any trouble with them.'"

Appellant's first testimony does not accord well with her later testimony. The latter, standing alone, would have been *prima facie* proof of the making of a representation, which, if false, would be a fraudulent misrepresentation, if the case had been tried to a jury. However, the court was the trier of the facts in this case. It passed upon the credibility of the witness, and held that the representation was not made. We are loath to hold this testimony to be so clear, cogent, and convincing that the court erred in not believing it.

Not having disturbed the court's findings of fact, we do not reach appellant's assignment of errors directed to rulings on laches and election of remedies.

The judgment is affirmed.

SCHWELLENBACH, C. J., GRADY, DONWORTH, and OLSON, JJ., concur.

---

May 13, 1952. Petition for rehearing denied.